# NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

# CER INC., Respondent.

No. 84–4582

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

June 10, 1985.

---

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Christopher Young, Washington, D.C., for petitioner.

Fulbright & Jaworski, T.J. Wray, R. Michael Moore, Houston, Tex., for respondent.

Louis V. Baldovin, Jr., Director, Region 23, N.L.R.B., Houston, Tex., for other interested parties.

Before WILLIAMS, JOLLY, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge.

This case is before the Court upon application of the National Labor Relations Board (the Board) pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (the Act), for enforcement of its unfair labor practice order against CER, Inc., respondent in this suit, for violations of Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by threatening on three occasions to discharge an employee, Frank L. Vernagallo, because of his union activities relating to conditions on the job and by subsequently constructively discharging him. Because we find no merit to any of CER's objections and because we find substantial evidence to support the Board's findings, the order of the Board will be enforced.

## FACTS AND PROCEDURAL HISTORY

In 1982, H.K. Ferguson Company, a general contractor, subcontracted the site preparation work for an expansion of the Anheuser-Busch Brewery in Houston, Texas, to CER. The general contractor was a party to a collective bargaining agreement[1] with the International Union of Operating Engineers, Local 450 (the Union), and CER also became a party to the agreement prior to beginning work on the brewery project. In addition, CER and the Union were parties to an agreement that pertained only to the brewery expansion project.

Curtis Roberts, a Union member, was foreman on the project. Vernagallo, a Union member, had a dispute with Roberts his first day on the job. Roberts assigned Vernagallo to operate a bushhog, which Vernagallo soon discovered required repair. When Roberts began to assist in the repair, Vernagallo discouraged him from doing so and later reported the violation of union work rules (for a foreman to perform craft work on the jobsite) to Union Steward Mike Tolopka.

The next day, Vernagallo referred Mike Shuttlesworth, an oiler, who had been assigned electrical and carpentry work by Roberts to the Union Steward concerning advice as to whether that work was in compliance with the Union's work rules.

---

1. This agreement provided in relevant part that any work subcontracted would be performed by union members in accordance with the terms and conditions of the agreement. *Inter alia,* the agreement placed restrictions on the work to be performed by employees classified as "firemen," "engineers," and "oilers," and additionally restricted the repair and operation of certain equipment to particular classifications of employees. For example, Section 9 of the agreement states that "Engineers, Firemen, and Oilers employed on a job to run equipment, fire, or oil, shall not be called upon to do any work other than such as is recognized as properly belonging to an Engineer, Fireman, or Oiler." Section 19(a) specified that "All repairs on equipment operated by Engineers ... must be performed by Engineers."

The same day, the roller that Vernagallo had been hired to operate arrived but it lacked a protective enclosure as required by the collective bargaining agreement. Vernagallo complained to the Union Steward about this deficiency. While later operating the roller, Vernagallo was given instructions by the superintendent, Junior Taylor, who was also the vice president of CER. Vernagallo complained to the Union Steward that his orders had not come through the foreman. Foreman Roberts joined the discussion and said that he would speak to Taylor about the requirement that orders come from the foreman.

The next day, a dispute arose over Roberts and Shuttlesworth starting work before the 7 a.m. starting time. Union Steward Tolopka criticized the rule violation in the presence of Vernagallo. A question later arose as to Vernagallo's role in furthering the discussion on the matter, i.e., acting as an intermediary between Roberts and Tolopka. Roberts reportedly commented to Tolopka that if Vernagallo "doesn't stay on his machine and quit sticking his nose in our business, we are going to have to get rid of that boy."

The next day, Vernagallo and Tolopka met with Union President Ty Bloodworth concerning violations of the collective bargaining agreement that they had observed on the jobsite. Bloodworth agreed to visit the jobsite to meet with Roberts, Taylor, and Tolopka.

Several days later, Vernagallo told the Union Steward Tolopka that with the number of Union members at the jobsite, an assistant foreman was needed. When telephoned by Tolopka, Bloodworth said that he would also deal with that matter.

The next day, Roberts, the foreman, approached Union Steward Tolopka and told him that if Vernagallo "doesn't quit calling the hall, I am going to run his ass off; we are going to get rid of that boy." When Tolopka denied that it was Vernagallo who had called the union hall, Roberts stated that "If I find out who it is, I am going to get rid of him."

The following day, Roberts told a group of employees that if he found out who had contacted the Union about how he was running the job, that person would be terminated.

The next day, Roberts and Union Steward Tolopka met after work concerning the work problems. At that time Roberts said to Tolopka concerning Vernagallo that "[i]f he doesn't start—quit causing this trouble, we are going to have to get rid of him; or [i]f he doesn't stop calling the hall, we are going to have to get rid of him."

Several days later, Vernagallo, who was assigned to operate water pumps that day, observed a laborer operating water pumps and told him that "the water pumps out here belong to the operating engineers; it is our equipment, and I would [appreciate] it if you would not crank it. The operators start and stop these pumps." A little later, he had a similar encounter with another laborer. When Vernagallo was assigned to run a pulverizer later that day, he told the operating engineer replacing him on the pumps to watch the laborers. Vernagallo himself again observed one of the laborers starting a pump, spoke to him, and then went to the acting steward. Vernagallo testified at the hearing before the administrative law judge as follows concerning his conversation with the acting steward: "I told him I had had trouble with the laborers that morning about the pumps, and I said to get them goddamn laborers off my equipment." When Roberts drove up, Vernagallo told him to "Get them goddamn niggers off of my water pumps. The water pumps belong to the operating engineers, and I am not going to stay out here and watch some other craft run them." Roberts then told Vernagallo to calm down and that he would take care of the problem. This incident occurred about 15 or 20 minutes before quitting time.

When Vernagallo reported to work the next day, June 24, 1982, he was called into the office with Foreman Roberts and Superintendent Taylor. Roberts gave him the following choice: "We have got two things we can do here; we have got two choices.

Either you can stay on your machine and quit jumping on me and these other operators out here about what goes on on this job, or we can terminate you now." Vernagallo's response was "Get my money." Following this incident Vernagallo then went off the payroll of CER.

Following the filing of charges with the Board, the case was tried before an administrative law judge (ALJ). The ALJ specifically found that the work rules of the general collective bargaining agreement applied at the brewery jobsite.[2] The ALJ further found that Vernagallo vigorously "sought to enforce work rules in an effort to have General Foreman Curtis Roberts cease his practice of frequently performing craft work, and also in order to protect such craft work from the laborers." The ALJ further found that CER violated Section 8(a)(1)[3] of the Act in that Roberts threatened to discharge Vernagallo if he did not cease his protected conduct, i.e., complaining to the Union that the working conditions on the job did not comply with the Union rules in the collective bargaining agreement. He concluded that CER had violated Section 8(a)(1) of the Act by threatening to discharge Vernagallo because of his union activities relating to conditions on the job.

As to Vernagallo's "constructive discharge" on June 24, 1982, the ALJ found credible the testimony of oiler Shuttlesworth that Roberts had boasted to him the next day that he had gotten rid of Vernagallo, the troublemaker. The ALJ observed that Roberts "never asserted that Vernagallo was not doing a good job in his work," but that Roberts' only concern was "that Vernagallo would 'not keep his mouth shut' when he observed violations of the contractual work rules." The ALJ found that, although Vernagallo was not fired outright, the choice given to him met the requirements of a constructive discharge as set forth in *Crystal Princeton Refining Co.*, 222 N.L.R.B. 1068 (1967). *See* part II, *infra.*

The ALJ recommended as a remedy that CER be ordered (1) to cease and desist its illegal conduct, (2) to post an appropriate notice, (3) to offer immediate and full reinstatement to Vernagallo, (4) to pay Vernagallo for lost pay with interest, and (5) to expunge any reference to the discharge from his personnel records.

The Board has affirmed the ALJ's findings and conclusions and adopted the recommended order. The Board now seeks enforcement of the order.

## ANALYSIS

CER makes three arguments in resisting enforcement of the Board's order. First, CER argues that Vernagallo's behavior was not protected concerted activity under Section 7 of the Act, characterizing his behavior as leaving his job duties to instruct other employees as to job duties and ordering the foreman to keep the "goddamn niggers" off certain equipment.[4]

---

**2.** The ALJ explained that in view of his making the finding that the rules of the collective bargaining agreement applied at the brewery jobsite, he need not consider whether a mistaken belief by Vernagallo as to their applicability would protect his efforts to enforce such rules. CER had argued that the contract specific to the brewery expansion project applied in lieu of the general collective bargaining agreement.

**3.** Section 8(a)(1), 29 U.S.C. § 158(a)(1), provides:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 157 of this title.

Section 157 of Title 29, Section 7 of the Act, provides in relevant part:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....

Section 7 of the Act protects the rights of employees to obtain union assistance in attaining compliance with a collective bargaining agreement. *See, e.g., NLRB v. Lantz,* 607 F.2d 290, 298 (9th Cir.1979); *NLRB v. Victor Otlans Roofing Co.,* 445 F.2d 299 (9th Cir.1971).

**4.** As part of this argument, CER asserts that Vernagallo's efforts seeking compliance with work rules concerned the wrong contract. We agree with the findings of the ALJ that the general collective bargaining agreement did apply to the jobsite. *See supra* notes 1 & 2.

Second, CER argues that Vernagallo was not constructively discharged because the requirements imposed upon him to work during work time and refrain from "jumping on" supervisors did not create conditions constituting a constructive discharge. Third, CER argues that Foreman Roberts was not an agent of CER.

## I. *Protected Concerted Activity*

CER contends that although an employee's assertion of a right grounded on a collective bargaining agreement constitutes concerted activity within the meaning of Section 7 of the Act,[5] the manner in which the employee asserts the claim may remove such conduct from the protection of Section 7. CER argues that because the collective bargaining agreement provided grievance and arbitration procedures, Vernagallo's actions in abandoning his own work to correct others about proper work assignments is not protected by Section 7. CER argues further that the types of violations which Vernagallo observed and sought to correct did not require immediate attention and were appropriate for the grievance procedure, and that consequently his failure to utilize the grievance procedure resulted in the loss of protection for his actions under Section 7.

■ The Board points out that Vernagallo's efforts to enforce the provisions of the collective bargaining agreement were not limited to instructing others as to their proper work duties but included, over a two-week period, complaints to the Union Steward, to the Union office, and to Foreman Roberts. The Board argues that grievance procedures do not preclude an effort to resolve grievances in an informal manner before resorting to formal grievance procedures. *See NLRB v. City Disposal Systems Inc.*, —— U.S. ——, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984).[6] We agree with the Board that Vernagallo's activities, for which CER threatened to discharge him, were protected under Section 7 of the Act.

## II. *Constructive Discharge*

CER argues that Vernagallo was not constructively discharged, but chose to quit his job when he could have continued working and changed the manner in which he protested the violations—through a grievance or unfair labor practice charge. CER denies that Roberts' statement to Vernagallo, quoted *supra*, presented a "Hobson's choice" as found by the Board.[7] The Board has described the elements necessary to establish constructive discharge as follows:

First the burdens imposed upon the employee must cause, and be intended to cause, a change in his working conditions so difficult or unpleasant as to force him to resign. Second, it must be shown that those burdens were imposed because of the employee's union activities.

*Crystal Princeton Refining Co.*, 222 N.L.R.B. 1068, 1069 (1976). The ALJ found that Vernagallo had been constructively discharged under this standard.

■ The specific facts of this case, however, rather than involving "difficult or unpleasant" working conditions leading to a decision to quit involve such a decision by Vernagallo when told to discontinue his protected activities of informally pointing out incidents of non-compliance with the

---

5. *See supra* note 3.

6. The Supreme Court observed:

It is reasonable to expect that an employee's first response to a situation that he believes violates his collective-bargaining agreement will be a protest to his employer. Whether he files a grievance will depend in part on his employer's reaction and in part upon the nature of the right at issue.... Thus, ... an employee's initial statement to an employer to the effect that he believes a collectively bargained right is being violated ... might serve as both a natural prelude to, and an efficient substitute for, the filing of a formal grievance. —— U.S. ——, 104 S.Ct. at 1514, 79 L.Ed.2d at 852–53.

7. The Random House Dictionary of the English Language 675 (unabridged ed. 1969) defines Hobson's choice as "the choice of taking either that which is offered or nothing; the absence of a real choice or alternative [after Thomas *Hobson* (1544–1631), of Cambridge, England, who rented horses and gave his customer only one choice, that of the horse nearest the stable door]."

provisions of the collective bargaining agreement. A decision to terminate employment in this situation can also constitute constructive discharge. The Tenth Circuit has articulated this interpretation of the Act as follows: "A constructive discharge in violation of the Act can be found, for example, when an employer informs his employees that they must choose between union activity and continued employment, and employees faced with this 'choice' decide to terminate their employment." *Cartwright Hardware Co. Inc., v. NLRB*, 600 F.2d 268, 271 (10th Cir.1979) (citing *American Enterprises, Inc.*, 191 N.L.R.B. 866, 868–69 (1971)). We find that the "Hobson's choice" presented to Vernagallo did constitute constructive discharge, as interpreted under the Act.

### III. *Agency of Foreman Roberts*

CER's final argument against the enforcement of the order is that Curtis Roberts was not an agent of CER for all purposes; accordingly, it disclaims any responsibility for the statements made by Roberts in violation of Section 8(a)(1) of the Act. CER focuses on Roberts' role within the Union and characterizes the entire dispute as an internal Union power struggle with Vernagallo on one side and Roberts on the other.

The ALJ considered this argument and specifically found that Roberts' actions were taken in his capacity as a statutory supervisor. We find that there is substantial evidence in the record to support the finding that Roberts' actions were attributable to CER. *See, e.g., NLRB v. Big Three Industrial Gas & Equipment Co.*, 579 F.2d 304, 309 (5th Cir.1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1501, 59 L.Ed.2d 773 (1979). Roberts' actions were consistent with those of a company foreman in furthering the work to be performed at the jobsite. The fact that he violated the Act by threatening to discharge any employee seeking to enforce specific provisions of the collective bargaining agreement to which CER and the Union were parties does not support CER's argument that

Roberts' actions were part of a Union struggle. Certainly, Vernagallo and the other employees had every reason to believe that Roberts' threats to discharge complaining employees were made in his capacity as CER's foreman at the jobsite. *See Procter & Gamble Manufacturing Co. v. NLRB*, 658 F.2d 968, 984 n. 18 (4th Cir.1981), *cert. denied*, 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 144 (1982).

### CONCLUSION

For the reasons stated in the opinion we find no merit to CER's objections to enforcement and we find substantial evidence in the record to support the findings of the Board. The decision and order of the Board is hereby enforced.

ORDER ENFORCED.