62 F.3d 1415
 150 L.R.R.M. (BNA) 2192
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
MONONGAHELA POWER COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
MONONGAHELA POWER COMPANY, Respondent.
 Nos. 94-1905, 94-2036.
 United States Court of Appeals,
Fourth Circuit.
 Augued April 4, 1995.
Decided: August 7, 1995.
 
 ARGUED: John Clark Unkovic, REED, SMITH, SHAW & MCCLAY, Pittsburgh, PA, for Petitioner. Robert James Englehart, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for respondent. ON BRIEF: David J. McAllister, REED, SMITH, SHAW & MCCLAY, Pittsburgh, Pennsylvania; Edward G. Kennedy, Fairmont, WV, for petitioner. Frederick L. Feinstein, General Counsel, Linda Sher, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Margaret Gaines Neigus, Supervisory Attorney, Deborah E. Shrager, NATIONAL LABOR RELATIONS BOARD, Washington, DC, for respondent.
 N.L.R.B.
 ENFORCED.
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 OPINION
 BUTZNER, Senior Circuit Judge:
 
 
 1
 Monongahela Power Company has petitioned for review of a decision of the National Labor Relations Board adopting an Administrative Law Judge's decision that Monongahela committed unfair labor practices in violation of 29 U.S.C. Sec. 158(a)(1) and (3). Monongahela Power Company, 314 NLRB 65 (1994). The Board has cross-applied for enforcement of its order. Because the Board's decision is supported by substantial evidence and contains no errors of law, we grant enforcement of the Board's order.
 
 
 2
 * The Board adopted the facts found by the Administrative Law Judge in his decision and supplemental decision. We briefly recount them.
 
 
 3
 Monongahela is a public utility providing electrical power from a substation in Morgantown, West Virginia. It has had a collective bargaining relationship with the International Brotherhood of Electrical Workers in the Morgantown Division since 1973. Jay L. Bolyard applied for a position as an apprentice electrician at the Morgantown facility.
 
 
 4
 Bolyard had two pre-employment interviews with Foreman Richard Sausen and Supervisor John Shawhan. During these interviews Sausen and Shawhan told Bolyard he must relocate from Rowlesburg, West Virginia (a one-hour drive from the substation) to somewhere within a thirty-minute driving range of the Morgantown facility. Monongahela needed its employees to be nearby for emergencies in all kinds of weather. They told Bolyard the relocation must occur before Bolyard could be converted from a probationary employee to a regular employee. Bolyard's family, which consisted of his wife and school-age daughter, was not discussed in connection with the 30-minute rule or otherwise.
 
 
 5
 On September 23, 1991, Bolyard was hired for a probationary period of six months in accordance with the collective bargaining agreement. In December 1991, Bolyard became a member of the local union.
 
 
 6
 In October 1991, Bolyard had a conversation with Sausen in which Sausen asked him whether he had found a place to live. Bolyard responded that he had not but that he was looking for a place. In December, Bolyard told Shawhan he was having trouble finding a place to live. Shawhan told him not to worry about it but to concentrate on getting his commercial driver's license. Nevertheless, Bolyard continued to look for a residence that would comply with the 30-minute rule.
 
 
 7
 In early March 1992, Bolyard found a trailer in Gladesville, West Virginia. He notified Sausen, who confirmed that it was within 30 minutes of the Morgantown facility and told Bolyard it was acceptable. No mention was made of Bolyard's family at this time.
 
 
 8
 On March 13, Sausen told Bolyard he was preparing to make Bolyard a regular employee effective at the end of his probationary period and on Bolyard's moving to the trailer at Gladesville. Sausen told Bolyard he was one of the best apprentice electricians he had seen, that he was getting along well with his peers, and that Sausen had received excellent reports on him. Bolyard informed Sausen that he would be moving to within the 30-minute limit but that his family would not join him until after his daughter had completed her gifted school program. Sausen said he had no objection to this plan but would consult with Shawhan.
 
 
 9
 A few minutes later Shawhan and Sausen came back to Sausen's office, where Shawhan told Bolyard his arrangement would not be acceptable because he believed Bolyard would go to Rowlesburg on weekends to be with his family.
 
 
 10
 Immediately after this meeting Bolyard spoke to Union Steward Timothy Hairston in the company's meter shop--a large open area about six feet from Sausen's office. Hairston and Bolyard went to Hairston's nearby locker and reviewed Article V, Section 6 of the union contract, which governs the company's right to impose restrictions on employees' living arrangements. The provision states:
 
 
 11
 It is agreed that employees may choose their place of residence without hindrance by the Company, but the parties hereto recognize that each employee must be reasonably available to the reporting headquarters to which he is assigned.
 
 
 12
 Shawhan was in the shop area during Bolyard's conversation with Hairston.
 
 
 13
 Between March 16 and March 26, Bolyard and Hairston spoke in the meter shop for several minutes each morning to discuss Bolyard's housing situation and his rights under the collective bargaining agreement. Sausen, whose office was adjacent to the meter shop area, was aware of these meetings.
 
 
 14
 During this time Bolyard continued to argue to Sausen that the 30-minute rule did not apply to employees' families. He kept Sausen apprised of his efforts to find housing.
 
 
 15
 During the week of March 16, Shawhan met with Morgantown Division Manager Robert Cockrell and told him it was unlikely that Bolyard would have his family moved by the end of the probationary period. Cockrell spoke to the vice president, Thomas Barlow, who advised him to release Bolyard. Cockrell was reluctant to discharge Bolyard without further exploring his situation.
 
 
 16
 On March 19, Bolyard met with Shawhan. They discussed the possibility of Bolyard's transferring from the Morgantown Division to Monongahela's general offices or to a power station, where Bolyard would not be subject to the 30-minute rule. Shawhan told Cockrell of this meeting and recommended that Bolyard be discharged. Cockrell told Shawhan he wanted to look into the situation.
 
 
 17
 On Friday, March 20, Shawhan told Bolyard that Cockrell had decided to put him on a trial period of employment following his probationary period. Bolyard said he felt discriminated against because he was married. He said there would not be a problem if the facility were nonunion. Shawhan replied that he did not have a problem with the union but that he had a problem with one man in the union. Bolyard said he had to keep his job.
 
 
 18
 Sausen called Bolyard into his office and told him he did not want to lose him. Shawhan entered the office and said he did not care whether Bolyard quit or not, that he was not changing his mind about Bolyard's family having to move. Bolyard then went to the meter shop and spoke to Hairston about the situation.
 
 
 19
 Bolyard returned Monday, March 23, and told Shawhan he wished to remain in his job. At Cockrell's direction, Sausen advised Bolyard that he and his family must be moved by May 29 or he would be discharged. Bolyard asked whether the date could be extended to the end of his daughter's school year. Sausen suggested he talk to Cockrell.
 
 
 20
 Bolyard went to Cockrell's office and discussed with him the possibility of an extension until June 22 or later. He argued that the 30-minute rule applied to employees only and not to their families. Cockrell said the company had done a poor job of communicating its position on that matter but that regardless of the circumstances, the family must relocate. He told Bolyard the date had been set by Thomas Bar low, the company's vice president, and that the matter was out of his hands. At this meeting there was some discussion of Bolyard transferring to another Monongahela facility.
 
 
 21
 On March 24, Bolyard found an apartment in Masontown, West Virginia. The landlord promised him the apartment would be available in about three weeks.
 
 
 22
 On March 25, Bolyard told Sausen he had found a place and that his wife would transport their daughter to school in Rowlesburg from their new home. Sausen told him to inform Shawhan of this arrangement. Shawhan was not in his office, so Bolyard went to Cockrell's office. He told Cockrell he had found a place to live and that, if necessary, his wife would drive their daughter to school in Rowlesburg until the end of the year.
 
 
 23
 After this meeting, Cockrell decided to release Bolyard from his trial period of employment. Shawhan and Sausen gave Bolyard his notice of termination on March 26. When Bolyard asked why he was being terminated, Shawhan replied that they did not have to tell him and were not going to tell him.
 
 
 24
 Adopting the ALJ's finding about a meeting that occurred the next day, the Board stated:
 
 
 25
 On March 27, 1992, Sausen held a regular morning meeting with Bolyard's former unit. He then asked the metermen to leave while he spoke with the electricians. The metermen, including Steward Hairston, left and Sausen gave an explanation for Bolyard's firing. He initially stated that Bolyard was not going to work out but when Mike Reneman asked why Bolyard was fired, Sausen replied that it was not his decision or something that he desired. He then said that Bolyard was working out very well, doing his job, learning his duties, and fitting in well with the work force but there were circumstances involving the decision to fire Bolyard which he could not discuss and that Bolyard was having problems relocating and it was causing problems with his family. He also said Shawhan had said Bolyard had expressed interest in advancing within the company and Shawhan felt, because of that interest, Bolyard would be unhappy as a substation electrician. Reneman interjected that Bolyard's alleged interest in advancement should be considered a plus. Sausen agreed with Reneman, and concluded that relocation was causing problems with Jay and his family.
 
 
 26
 Later, in a letter to the regional director, Monongahela's counsel gave still another reason for Bolyard's discharge:
 
 
 27
 Because the Charging Party had been told explicitly prior to the time of his hire what Monongahela expected of him, because he did not adhere to that requirement, and because in March he continued to be evasive as to when and if he was going to comply with the 30-minute rule, Cockrell decided that it would not be in Monongahela's best interest to continue to spar over the issue. Monongahela believes that the 30-minute rule is necessary for its service to customers, and that it should not permit that rule to be eroded. Monongahela did not want to begin any employment relationship with a dispute over this issue. Therefore, as was its right under the collective bargaining agreement, Monongahela terminated the Charging Party's employment before the end of his trial period because it simply did not wish to engage in continuing debate with him on this rule or police his compliance with it.
 
 
 28
 The union filed a grievance on behalf of Bolyard, but Monongahela rejected it as improper because Bolyard had been a trial employee. Bolyard initiated an action before the National Labor Relations Board, charging that Monongahela had discharged him in violation of the National Labor Relations Act.
 
 
 29
 On April 13 and May 26, 1992, Shawhan removed from a company bulletin board union newsletters which contained, among other unionrelated items, information about Bolyard's discharge and pending suit before the Board. Cockrell removed a similar newsletter on August 24, 1992. The union filed no grievance over the removals but filed a charge with the Board after the first notice was removed. The charge was consolidated with Bolyard's charges.
 
 
 30
 The Administrative Law Judge found that Monongahela violated 29 U.S.C. Sec. 158(a)(1) and (3) when it discharged Bolyard because of his concerted and union activity in challenging the applicability of the 30-minute rule to his family. The ALJ also found that Monongahela violated 29 U.S.C. Sec. 158(a)(1) when it removed union newsletters from the bulletin board without the permission of the union. In a supplemental decision, the ALJ, in response to the Board's remand, clarified his initial decision.
 
 
 31
 The Board issued a decision and ruling affirming the ALJ's rulings, findings, and conclusions and adopting, with some modification, the ALJ's recommended orders. Monongahela Power Co., 314 NLRB 65 (1994).
 
 II
 
 32
 The Board's findings are conclusive "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. Sec. 160(e)-(f). A reviewing court may not displace the Board's findings if they are supported by substantial evidence, even if the court justifiably would have decided the matter differently if reviewing the evidence de novo. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).
 
 
 33
 Under the National Labor Relations Act, 29 U.S.C. Sec. 151 et seq., an employer may not interfere with the right of employees to engage in concerted or union activity. 29 U.S.C. Secs. 157, 158(a)(1). An employer may not discriminate in regard to employment to discourage membership in any labor organization. 29 U.S.C. Sec. 158(a)(3).
 
 
 34
 A violation of the Act is established if the Board proves that an employee's concerted or union activities were a motivating factor in the employer's decision to terminate him, unless the employer proves in defense that the employee would have been discharged absent the protected activities. See Director, Office of Workers' Compensation Programs v. Greenwich Collieries, 114 S.Ct. 2251, 2257-58 (1994); Salem Leasing Corp. v. NLRB, 774 F.2d 85, 87-88 (4th Cir.1985).
 
 
 35
 Determining whether activity is concerted and protected "is for the Board to perform in the first instance as it considers the wide variety of cases that come before it." Eastex, Inc. v. NLRB, 437 U.S. 556, 568 (1978). This determination implicates the Board's expertise in labor relations, and a reasonable construction of the Act by the Board is entitled to considerable deference by reviewing courts. NLRB v. Local Union No. 103, Int'l Ass'n of Iron Workers, 434 U.S. 335, 350 (1978); NLRB v. City Disposal Systems, Inc., 465 U.S. 822, 829-30 (1984).
 
 
 36
 In City Disposal Systems, 465 U.S. at 829, the Court upheld the Board's view that activity by an individual is concerted, and therefore accorded the protection of 29 U.S.C. Sec. 157, if it is reasonably directed toward the enforcement of a collectively bargained right. See Interboro Contractors, Inc., 157 NLRB 1295, 1298 (1966). The Court in City Disposal Systems recognized that an individual's invocation of a right grounded in a collective bargaining agreement is "an integral part of the process that gave rise to the agreement." 465 U.S. at 831. The Court stated:
 
 
 37
 As long as the employee's statement or action is based on a reasonable and honest belief that he is being, or has been, asked to perform a task that he is not required to perform under his collective-bargaining agreement, and the statement or action is reasonably directed toward the enforcement of a collectively bargained right, there is no justification for overturning the Board's judgment that the employee is engaged in concerted activity, just as he would have been had he filed a formal grievance.
 
 
 38
 465 U.S. at 837.
 
 
 39
 The question remains whether substantial evidence supports the Board's application of these well-established principles of law to the facts of this case.
 
 III
 
 40
 Monongahela asserts that Bolyard acted purely out of self-interest and that his assertion of his interpretation of the 30-minute rule was not concerted activity within the meaning of the Act. Monongahela argues that, with one exception, every employee of the Morgantown Division who had a family lived with his or her family within 30 minutes of the facility. It relies on two arbitration decisions that uphold the 30-minute rule, and it contends that one of these is precisely on point. It insists that Bolyard must have been aware of these facts and that his interpretation of the rule was not reasonable. Bolyard's repeated references throughout his probationary period of employment to moving his family, Monongahela argues, prove that his interpretation was not reasonable or honest.
 
 
 41
 As to Bolyard's sincerity, which Monongahela questions, his references to moving his family are consistent with the simple explanation that he did not wish to be separated from his family indefinitely.
 
 
 42
 The Board did find that much of Bolyard's protest was directed at his personal situation. But as the Court noted in City Disposal Systems, a single employee's invocation of the collective bargaining agreement affects all employees and constitutes concerted action "regardless of whether the employee has his own interests most immediately in mind." 465 U.S. at 830. Bolyard's unsuccessful efforts to accommodate his daughter's attendance at her school by not moving his family until after the school year ended in June does not vitiate the Board's finding that Bolyard's activity was reasonably related to a right grounded in the labor agreement and thus concerted.
 
 
 43
 The Board found that Bolyard had a reasonable basis for questioning whether the 30-minute rule applied to his family. The collective bargaining agreement states that "each employee must be reasonably available" to his assigned work location. The agreement does not explicitly require an employee's family to live within the 30-minute area. As a matter of custom and convenience, employees' families live there. Before March 1992, Bolyard was unaware that the company interpreted this provision to apply to the employee's family as well as the employee. And as the Board found, no employee before Bolyard ever raised the question whether the 30-minute rule applied to an employee's family.
 
 
 44
 Whether Bolyard was supported in his interpretation of the 30-minute rule by his fellow employees or by the union has no bearing on whether his activity was concerted. Indeed, City Disposal Systems involved a single worker who refused to drive a truck he claimed was unsafe. The union in that case declined to file a grievance on the worker's behalf. 465 U.S. at 827. The Court nonetheless upheld the Board's finding that his activity was concerted inasmuch as the employee based his conduct on "an honest and reasonable invocation of a collectively bargained right." 465 U.S. at 840.
 
 
 45
 Contrary to Monongahela's representations, the arbitration decisions on which it relies did not address the precise issue Bolyard sought to raise with management--whether the 30-minute rule applied to an employee's family. The first arbitration on which Monongahela relies held only that the "reasonably available" rule means within 30 minutes. The issue decided by this arbitration is not contested here. Bolyard and the company were in agreement that the collective bargaining agreement implicitly refers to a 30-minute rule.
 
 
 46
 Monongahela says the second arbitration deals with the precise issue at the core of this case. But careful examination of the arbitrator's decision discloses that it does not support Monongahela. An employee established a nominal residence within the 30-minute zone, but in fact he lived farther away with his family. The arbitrator held that the employee's misrepresentation violated the bargaining agreement. The scope of the award is shown in the remedy. The employee was required to comply with the bargaining agreement by moving within the 30-minute zone. Significantly, the award was silent about the employee's family. No provision of the award required the family to move.
 
 
 47
 The Board found that Bolyard's arguments with management over the scope of the 30-minute rule constituted concerted activity within the meaning of the Act. Substantial evidence supports this finding.
 
 
 48
 The Board's finding that Bolyard engaged in union activity is also supported by substantial evidence. The Board reasonably found that Bolyard's daily consultations with Union Steward Hairston regarding the application of the 30-minute rule constituted union activity within the meaning of the Act. See NLRB v. CER, Inc., 762 F.2d 482, 485-86 & n. 3 (5th Cir.1985) (section 157 protects the right of obtaining union assistance).
 
 
 49
 Monongahela protests that it did not know of Bolyard's union activity. The evidence supports the Board's inference to the contrary. The discussions between Bolyard and Hairston began immediately after Shawhan told Bolyard his planned living arrangements were unacceptable. Shawhan was still in the shop area when the first discussion took place. The discussions occurred in an open area near foreman Sausen's office. The company's failure to call Sausen as a witness permitted an inference that Sausen would have confirmed Bolyard's claim that Sausen knew Bolyard and Hairston were conferring. See Golden State Bottling Co. v. NLRB, 414 U.S. 168, 174 (1973).
 
 
 50
 In explanation of Bolyard's termination the company wrote to the Board's regional office that it had "decided that it would not be in Monongahela's best interest to continue to spar" over the 30-minute rule and that Monongahela terminated Bolyard because "it simply did not wish to engage in continuing debate with him ... or police his compliance with" the rule. These statements support the Board's inference that Bolyard was discharged because of his protected activity in challenging the company's interpretation of the 30-minute rule.
 
 
 51
 The company refused to give Bolyard any reasons for his discharge. Indeed, Shawhan was openly hostile to Bolyard's request for an explanation. Cockrell testified that company policy was not to inform a trial employee of the reasons for his termination. But in light of Sausen's recent praise of Bolyard and preparations to make him a regular employee, the refusal to state why Bolyard was being fired supports the Board's inference that the reason was his protected activity. As the Board noted, the inconsistent reasons for Bolyard's discharge provide evidentiary support for the Board's decision.
 
 
 52
 The abruptness of Bolyard's discharge also supports the Board's finding of unlawful motivation. Bolyard was terminated the day after he informed Sausen and Cockrell that he would comply in all respects with their interpretation of the rule, and three days after notice that he would be granted a sixty-day trial period. Monongahela's argument that Bolyard was fired because he failed to comply with the 30-minute rule is unconvincing in light of these facts. We uphold the Board's conclusion that this explanation was pretextual.
 
 
 53
 With regard to Bolyard's union activity, Shawhan conceded that he was upset at Union Steward Hairston because Hairston was pressing a safety-related grievance in a manner Shawhan did not approve. At the same time, Bolyard's problems with the 30-minute rule arose and he began conferring with Hairston. Shawhan told Bolyard about Hairston's safety complaint and said he took all complaints personally.
 
 
 54
 The Board found that Shawhan's animosity toward Hairston carried over to Hairston's conferences with Bolyard and that Shawhan was concerned lest Hairston interject the union into the ongoing arguments between management and Bolyard over the 30-minute rule. The above facts support the Board's conclusion that Monongahela fired Bolyard because of his protected union activity in conferring with Hairston at a time when management, in the person of Shawhan, was particularly upset at Hairston as a union representative.
 
 
 55
 Monongahela argues that it terminated Bolyard because he had become bitter toward the company and because he had expressed dissatisfaction with conditions at the Morgantown Division.
 
 
 56
 The Board found that Bolyard did explore, with both Shawhan and Cockrell, the possibility of transferring to another division of the company. Nevertheless, we uphold the Board's finding that Bolyard's interest in other positions was not reasonably viewed as dissatisfaction with the Morgantown Division. The evidence as a whole supports a finding that Bolyard's interest in other positions was motivated by a desire to move up in the company and by a fear that he would not satisfy the qualifications for the electrician's position. The Board reasonably concluded from the evidence that Monongahela's proffered reasons for discharging Bolyard were pretextual.
 
 IV
 
 57
 Monongahela claims the Board should have deferred the union's newsletter charge to arbitration rather than consolidate it with Bolyard's suit. It contends that the Board erred when it ruled that the issues involved in the two cases were so interrelated as to justify consolidation. Moreover, it claims, the Board's finding that the removal of newsletters violated the Act is not supported by substantial evidence and is erroneous as a matter of law.
 
 
 58
 We review the Board's decision whether to defer an issue to arbitration for abuse of discretion. See NLRB v. American Nat'l Can Co., 924 F.2d 518, 522 (4th Cir.1991). Monongahela correctly points out that the Board's discretion whether to defer is limited by its prior decisions recognizing a national policy in favor of resolving disputes through contractual grievance procedures. See Equitable Gas Co. v. NLRB, 966 F.2d 861, 864-65 (4th Cir.1992). The Board may, however, refuse to defer when "an allegation for which deferral is sought is inextricably related to other complaint allegations that are either inappropriate for deferral or for which deferral is not sought." American Commercial Lines, Inc., 291 NLRB 1066, 1069 (1988); Equitable Gas, 865 F.2d at 865.
 
 
 59
 The Board found that the newsletter charge was inextricably interrelated with Bolyard's pending charges and refused to defer it to the contractual grievance procedure. Each of the three newsletters specifically referred to Bolyard's "firing" or "dismissal." Each was removed by either Shawhan or Cockrell, both of whom played an important part in Bolyard's discharge. The first two removals occurred within a few weeks of Bolyard's termination. The Board exercised sound discretion in consolidating the charges.
 
 
 60
 Substantial evidence supports the Board's finding that Monongahela's removal of the newsletters violated the Act. Pursuant to the collective bargaining agreement, the union is permitted to post "reasonable and proper" notices on the bulletin board "covering legitimate union business." The first newsletter was posted on April 13, two weeks after Bolyard's discharge. It stated that union members were "up in arms over the firing of an electrician apprentice for not moving his family" and informed employees that the case was under review by the Board. Shawhan removed the notice on the morning of April 13.
 
 
 61
 Shawhan removed a second, similar newsletter on May 26. Shawhan and Cockrell explained to the local union representative that the newsletters contained improper organizational information and misinformation and tended to put the company in a bad light.
 
 
 62
 Cockrell removed a third newsletter on August 24 on the grounds that it imputed misleading statements to Monongahela management and criticized the company's health insurance coverage.
 
 
 63
 The Board concluded that the company's objections to the newsletters were pretextual. We agree that any factual inaccuracies contained in the newsletters did not remove them from the realm of being "reasonable and proper." The expression of opinion by a union, when not done in a defamatory, outrageous, or unduly inflammatory manner, is reasonable and proper.
 
 
 64
 We uphold the Board's finding that the company sought to stifle dissemination of information relating to Bolyard's discharge, leading to a chilling and coercive effect on employee rights under the Act. See 29 U.S.C. Secs. 157, 158(a)(1). When an employer permits a union to place notices on a bulletin board, it may not remove them simply because it disagrees with their contents or finds them distasteful. See NLRB v. Container Corp. of America, 649 F.2d 1213, 1215-16 (6th Cir.1981).
 
 
 65
 In sum, we conclude that the Board's order complies with the Act and that it is supported by substantial evidence.
 
 
 66
 ENFORCED.